1    Q.    So what that means is, is that web site
2    accessible to the public or is that accessible only
3    to internal?
4    A.    Internal.  And everybody gets a copy of it
5    when they -- either when they are interviewed or when
6    they are hired.
7    Q.    Very good.  Are you able to testify as to
8    the existence of other handbooks, SOPs, list of
9    rules, expectations, et cetera that existed and exist
10   today for Goldberg and Associates?
11   A.    Yes.
12   Q.    All right. And are you able to testify as
13   to any prior or previous lawsuits, charges, cases or
14   complaints brought against Goldberg and Associates or
15   yourself by any individual related to any type of
16   term of condition of employment?
17   A.    Yes.
18   Q.    Very good.  Are you able to testify as to
19   any interactions between Goldberg and Associates and
20   the State or Federal Department of Labor or any
21   agents that work there, or any advice sought from any
22   professionals regarding the payment of employees?
23   A.    I believe the HR had some consultations
24   regarding -- so I don't think we've had -- I believe
25   that HR has had several and one attorney has had

```
 1    several interactions that I have not been a part of.
 2              So I don't know how much I'd be able to
 3    testify to that, to be honest.
 4         Q.   Do you know if those conversations
 5    occurred prior to Ms. Coker's employment at Goldberg
 6    and Associates?
 7         A.   They did.  I think they are ongoing with
 8    HR.
 9         Q.   Are you able to testify as to the hiring
10    process of Goldberg and Associates?
11         A.   Yeah.
12         Q.   Are you able to testify as to who was
13    working at Goldberg and Associates during the time
14    that Ms. Coker was working at Goldberg and
15    Associates?
16         A.   Exactly --
17              MR. ANDERSON:  Ms. Goldberg, are you
18         still with us?
19              (No response)
20              MR. ANDERSON:  Mr. Brown, are you
21         able to get in touch with your client?
22              MR. BROWN:  I'm trying to get in
23         touch right now.
24              MR. ANDERSON:  She has dropped from
25         the Zoom meeting.
```

1       Q.    Okay.  Is that true for the California
2   office as well, and New York office, and Michigan
3   office?
4       A.    Yes.  We have a Bank of America just for
5   more like petty cash stuff for the LA office.
6       Q.    Okay.  All right.  Regarding -- we've
7   touched on this, but I want to go a little bit deeper
8   regarding interactions and advice between Goldberg
9   and Associates and/or yourself and any state or
10  federal Department of Labor office or agents.
11              Can you describe what contacts and advice
12  you sought and received from the Department of Labor
13  and/or Department of Labor agents of the federal
14  government or any state?
15      A.    I believe that Megan did research or
16  reached out to them and -- with an attorney when she
17  was setting up regulations.
18      Q.    And do you know the substance of what she
19  was able to learn by going through that?
20      A.    That would be a conversation you'd have to
21  have -- those would be questions to her.
22      Q.    But as the 30(b)(6) --
23      A.    I -- yeah.  I mean, I don't know which
24  ones would be subject to attorney/client
25  confidentiality.  I would have to check into that.

```
1           Q.     But as your 30(b)(6) representative, you
2    are not prepared to discuss --
3           A.     It's not that I'm not prepared.  It's that
4    I think that my recollection -- I -- I don't
5    necessarily remember.
6                  I remember that we fulfilled our duty in
7    not only meeting with an attorney, but also
8    researching on the Department of Labor and putting
9    together certain policies.
10                 So beyond that, I think it might go into
11   attorney/client privileged information.
12          Q.     What did you learn --
13                 THE WITNESS:  Mr. Brown, are you
14         there?
15                 MR. BROWN:  I am.  I don't have a
16         response to that at this time.  I would
17         have to reach out to the office.
18   BY MR. ANDERSON:
19          Q.     My next question is -- one moment --
20   pursuant to 30(b)(6) Notice of Deposition paragraph
21   eight:  The 30(b)(6) representative that was
22   appointed by the firm is to be able to discuss any
23   interactions between the defendant and the state or
24   federal Department of Labor.
25                 Are you saying you are not able to discuss
```

1    the substance of those interactions?
2         A.    What I'm saying is when we set up the
3    policy, we took appropriate actions to do research
4    both on the Department of Labor and with outside
5    counsel to make sure that we were in compliance.
6               If you want the specifics, they were
7    ongoing through several years and I'm not sure
8    exactly what you are asking beyond that.
9         Q.    Okay.  So my question is just to be
10   tailored specifically so as to avoid a privilege
11   problem at this moment is to discuss interactions
12   with Department of Labor or Department of Labor
13   agents.
14              I understand that your representation here
15   is that you had appropriate discussions.  My question
16   is what was the substance of those conversations,
17   what did you learn and put into action regarding your
18   HR policies after those conversations?
19        A.    With regard to what area?  There are --
20        Q.    Let's start with, with regard to the
21   administrative exemption.
22        A.    Okay.  So there was research on the
23   Department of Labor of what the minimum wage, what
24   the requirements were in order to -- whether an
25   employee was exempt or not.

1      Q.    Okay.  And what was the substance of that
2  research?  What did the research produce?  Do you
3  have documents that you relied upon?
4      A.    So I'm not sure that I fully understand.
5  It's a two-part question.  So maybe break it apart.
6      Q.    Sure.  So you said that you did research
7  with the Department of Labor --
8      A.    Well, let me be clear.  I did not do the
9  research.  So I want to be clear.  HR and the
10 attorney did research.
11     Q.    Understood.  And I'm not asking what the
12 attorney advised you.  But in your 30(b)(6) role here
13 in this deposition, I am asking you what was the
14 result of the research that you did with the
15 Department of Labor --
16     A.    Let's start there so I can answer one
17 question at a time.
18     Q.    Yeah.
19     A.    So the result was we created a policy in
20 hiring on what employees were exempt and what
21 employees were not exempt.
22     Q.    Are you able to share that policy?
23     A.    Don't you have a copy of our policy?
24     Q.    I don't think I have a copy of that
25 specific policy.  So are you able to share that?

```
1        A.      To the extent that -- I mean, I would have
2    to look to see how much is privileged information.
3    So I would have to look through to see the
4    communications.
5                But I do know that the result of the
6    research was that we determined in hiring, who was
7    exempt and who was not.  And that was done through
8    internal communications and I would have to check to
9    see whether that communication is privileged or not.
10       Q.      Internal communications among whom?
11       A.      Amongst the attorney, HR and me.
12       Q.      Who is the attorney?
13       A.      Again, I'm terrible with names.  I believe
14   Megan had already provided that -- or my office had
15   already provided that.
16       Q.      Is this an external attorney?
17       A.      Uh-huh.
18       Q.      Yes?
19       A.      Yes.  And I believe she already provided
20   that.
21       Q.      You don't -- as your 30(b)(6)
22   representative, you don't know the name of the
23   attorney that upon whose advice --
24       A.      Again, I have to tell you, I'm really bad
25   with names.  It's not my forte.  So even if I had
```

```
 1    looked at the information, I probably wouldn't be
 2    able to repeat it.  I'm terrible with names.
 3         Q.    Other than the policy that you created, do
 4    you have a record of advice or documentation that you
 5    relied upon from the Department of Labor of the state
 6    or the federal government in order to formulate these
 7    policies?
 8         A.    I believe that was already provided to you
 9    from the stuff that was downloaded from the
10    Department of Labor.
11         Q.    So as a 30(b)(6) representative today, I'm
12    asking you if you have access to and can provide
13    those documents?
14         A.    I could probably provide it, but I believe
15    it was already provided.  Are you asking me to
16    provide it again?
17         Q.    You do not have them with you at this
18    moment?
19         A.    No.
20         Q.    I'm representing to you that, no, those
21    documents have not been provided.  So how long would
22    you need to be able to provide those documents?
23         A.    So here would be my recommendation, after
24    we finish, there are several things you need.  Maybe
25    you could e-mail my attorney a list of all the things
```

```
 1    you need.  And if you could give me 10 days just
 2    because I'm a little backlogged coming off of leave,
 3    I will make sure you get everything in the list that
 4    we've agreed.  Would that be acceptable?
 5         Q.   10 days should be just fine.  Thank you.
 6         A.   Okay.
 7         Q.   But you do believe that the documents
 8    relied upon from the Department of Labor in that
 9    research would be among the documents you could
10    provide in that timeframe?
11         A.   Yes.
12         Q.   Very good.  Thank you.
13              MR. BROWN:  Just to be clear on the
14         record, we're saying that all document
15         requests to be done within 10 days rather
16         than seven as was previously stated?
17              MR. ANDERSON:  10 will be fine,
18         Austin.
19              MR. BROWN:  Okay.  Thank you.
20    BY MR. ANDERSON:
21         Q.   You mentioned that you sought advice in
22    addition from an attorney, an external attorney whose
23    name you will also be one of the things you can
24    provide to us, yes?
25         A.   That was already provided because they
```

1        A.      In between --

2        Q.      Sorry?  Go ahead.

3        A.      In between questions, I'm going to mute.

4    It's starting to getting later in the morning so it's

5    starting to get some activity here.  I apologize.

6        Q.      That's all right.  I'm going to turn now

7    to Exhibit 9.  Exhibit 9 is a multi-page document

8    that I'm showing on the screen now.  It goes from

9    Defendant's JLF77 consecutively through Defendant's

10   JLF113.  So that's a total of 37 pages.

11              And it is a transcript -- or appears to be

12   a transcript of WhatsApp messages.  Have you seen

13   this before?

14              Ms. Goldberg, if you are answering, you

15   are muted, I imagine.

16       A.      I apologize.  I believe these were

17   WhatsApp messages that were given over in discovery.

18       Q.      Have you seen them before?

19       A.      At some point, yes.

20       Q.      Were you involved in the redaction of

21   these messages?

22       A.      They consulted me, but there was an

23   attorney in my office that did it.

24       Q.      Do you have access to the unredacted

25   version of this?

```
1          A.    I do.  But the only thing that was
2     redacted was client names or information.  I think it
3     was just names.  Or if it was something -- you know,
4     it was just names that were redacted.
5          Q.    Okay.  But you do have an unredacted
6     version?
7          A.    I do.
8          Q.    Do you have that present with you right
9     now?
10         A.    I do not.
11         Q.    Okay.  Some threshold issues, this seems
12    to be a conversation between Sade Coker and heart,
13    heart, heart, heart.  Is heart, heart, heart, heart
14    you?
15         A.    Yeah.
16         Q.    And it seems to go from September 26th,
17    which would be shortly after Ms. Coker worked for
18    Goldberg and Associates, and goes -- if I go all the
19    way down to page 37 -- to November -- excuse me --
20    November 1, which is -- has conversations regarding
21    her pay and it's subsequent to her termination.
22               Is that your understanding is that this is
23    all WhatsApp messages between you and Ms. Coker?
24         A.    Yes.  I believe so, yes.  She might have
25    texted me, but I think we provided -- she might have
```

1    texted me on the office phone.  But, yeah.
2         Q.    All right.  Throughout this -- I'm going
3    to scroll back to the top.  It starts at the top
4    pretty early.  But throughout it, there are
5    references -- for instance, here on page JLF081 -- of
6    attached audio with a file named dot OPUS.
7              Do you know what those are that say
8    attached audio?
9         A.    Yeah.  So most of the time, I was in a
10   hurry and I would voice text the information.  The
11   problem that we were having was separating -- this is
12   a lot of client stuff.
13             The problem that we were having was
14   separating out like client attorney privileged
15   information because these were text messages with
16   regard to specific clients.
17        Q.    Right.  So do you have these audio files?
18        A.    I do.
19        Q.    Okay.  Because I do note that in your
20   supplemental responses, it did indicate that you were
21   having trouble separating those out.  These were
22   filed for reference on October 28th, 2022.  And that
23   you were trying to separate those.
24             What has been done since October 28th,
25   2022 to be able to deliver these audio files?

1    A.    So, I would have -- you know I was out on
2    leave, right, from that time until just a few days
3    ago.  So I would have to double-check.
4         The problem is I'm not sure how we go
5    about -- because it's all client information.  I
6    believe they did turn over the audios that did not
7    relate to client information.
8    Q.    Why do you believe that?
9    A.    My understanding is that someone had gone
10   through them and anything that was not client related
11   was turned over.  Like didn't have client attorney
12   confidential information.
13   Q.    If I was to represent to you that no audio
14   files have been turned over --
15   A.    Here's the other problem.  Ms. Coker has
16   these on her WhatsApp.  So wouldn't that be the best
17   source for you to get these?
18   Q.    But we're talking about what you've turned
19   over.  And so on October 22nd --
20        THE WITNESS:  Mr. Brown, correct me
21   if I'm wrong, but if they already have the
22   information...
23        MR. BROWN:  They should be able to
24   get it, but I will review with the office.
25        THE WITNESS:  My question is if